PEOPLE *v.* DROWN *et al.*

(*Supreme Court, General Term, Fifth Department.* June 2, 1891.)

CRIMINAL LAW—CHARACTER OF DEFENDANT.

On an indictment for receiving stolen goods, the court, referring to evidence of good character introduced by defendants, charged the jury that "while, of course,

good character at no time shields or should shield a man from punishment for crime, it is, in and of itself, one of the most powerful, and at the same time one of the most insidious, influences that finds the way into the court-room. So, gentlemen, it will be your duty carefully to consider how far and in what manner this presumption of innocence and this proof of good character has any influence or weight on the proof which has been presented on the part of the people." The court then refused to charge at defendants' request that "good character in a doubtful case is usually sufficient to exculpate the defendants." *Held*, that such charge was erroneous, as tending to mislead the jury as to the effect to be given to the evidence of good character.

Appeal from court of sessions, Monroe county.

Newton A. Drown and others were convicted of the crime of feloniously receiving stolen property, knowing it to have been stolen, under section 550 of the Penal Code; and from such judgment of conviction, and from an order denying their motion for a new trial on the minutes, bringing up the decision of the same court denying a motion in arrest of judgment, and an order overruling the defendants' demurrer to the indictment, they appeal.

Argued before DWIGHT, P. J., and MACOMBER, J.

*W. Henry Davis*, for appellants.    *William P. Goodelle*, for the People.

MACOMBER, J.   The appellants were jointly indicted with one George W. Drown, composing the firm of Drown Bros. & Co., for having feloniously received certain brass car journals stolen from the Syracuse, Ontario & New York Railroad Company.   The jury acquitted George W. Drown, but found the other two defendants guilty.   The defendants have for several years been doing business in the city of Rochester as dealers in metals and junk.   It is claimed on behalf of the people that Clarence Turner and William Campbell, ostensibly peddlers, but in reality thieves, and the former an inmate of state's prison at the time of the trial, undertook to find, with the defendants, a market for the brass fittings and steel railroad journals which they intended to steal either from the above-mentioned railroad company or from some other.   Turner testified that he had a talk with Newton Drown before the theft in question, in which he informed him of this felonious purpose.   He swears that Drown told him there had been trouble about railroad brass, and that he did not want to handle any brass which was taken near Rochester; whereupon Turner assured him that he would not bother anything close to Rochester. He further testified that Newton Drown told him not to put too much in a barrel.   Turner and Campbell reached Port Byron on the 7th day of January, 1887.   They then walked to Weedsport, where they jacked up five cars, and took out brass journals, and broke into the car inspector's building, and stole 300 pounds more of new brass journals.   Turner testified that the next day these brass journals were barreled up, taken to Jordan on the New York Central Railroad, and shipped to Drown Bros. & Co., at Rochester, as old rubber, and as coming from Charles Thomas.   It is further testified by Turner that on the night of the 9th, or early in the morning of the 10th day of January, 1889, he and Campbell jacked up the axles of six cars of the Syracuse, Ontario & New York Railroad Company, and stole about 400 pounds of brass journals.   These were also, he says, put in a barrel, headed up, and taken by Turner and Campbell to the New York Central station at De Witt, and by them shipped to Drown Bros. & Co., at Rochester, as T-lead, and as coming from George Smith.   On or about the 18th of January, 1889, the defendant Newton Drown received these two packages, one marked "T-Lead," and the other "Old Rubber," and duly receipted for the same.

The defendants claim that the story told by Turner and the witness Boas, also a felon, is entirely untrue; that they made no arrangements with Turner and Campbell, or either of them, for the shipment of railroad brasses or other railroad property, but that they received these two consignments believing that the one contained old rubber and the other T-lead.   They deny emphatically that there were, in the barrels received by them, any brasses whatever.   There

is no evidence to corroborate Turner upon the question whether these barrels actually contained brasses or not, except some slight circumstances. It is extremely doubtful from the whole evidence whether the witness Turner has been corroborated in respect to the actual presence of brass in the packages received by the defendants, so that it may be said that there is other evidence than his own to connect the defendants with the commission of the crime charged under section 399 of the Code of Criminal Procedure. Whatever took place prior to the reception by the defendants of these two barrels, it is quite clear that their intention to receive goods, knowing them to be stolen, could not be made out unless it was established that the barrels actually contained stolen brass, and not old rubber or T-lead. So far as can be discerned from the evidence, there is nothing to corroborate Turner, except some slight circumstances which render it extremely doubtful whether it was competent for the court to submit the question of the guilt or innocence of the defendants to the jury. But upon this matter we do not now definitely pass, because, whatever may be our view of it, we think the learned county judge fell into an inadvertent error in his charge to the jury, which should necessarily lead to a reversal of the judgment in any event. The defendants had shown affirmatively, in the way in which such facts are usually established, that they were men of good character. Such good character was relied upon by the counsel to protect them against many embarrassing circumstances, and from the evidence of two apparently utterly corrupt men, Turner and Boas. The circumstances alluded to were, in the main, brought about by the machinations of these two felons and Campbell. Under these circumstances, it was of the greatest importance that the jury, in passing upon the question of the guilt or innocence of the defendants, should have had laid before them the correct principle in respect to the defense of good character. It is not too much to say that judges and others have often witnessed the exculpation of persons charged with crimes where the evidence was quite as strong against them as it is in this case, because up to the time of the charge made they were men of honest repute. The learned judge said in his charge: "Then, gentlemen, you have to consider the further fact that in every criminal case, and particularly in a case of this character, where the nature of the business in which a man is engaged itself involves himself sometimes in suspicion and in trouble without any guilty intent on his part, that a life-long good character means all that it means under any circumstances; and while, of course, good character at no time shields or should shield a man from punishment for crime, it is, in and of itself, one of the most powerful, and at the same time one of the most insidious, influences that finds the way into the court-room. So, gentlemen, it will be your duty to carefully consider how far and in what manner this presumption of innocence and this proof of good character has any influence or weight on the proof which has been presented on the part of the people." Evidently referring to this portion of the charge, the counsel for the defendant asked the court to charge as follows: "I also ask the court to charge that good character in a doubtful case is usually sufficient to exculpate the defendants. *The Court.* I decline to charge, except as I have charged. (Exception.)" The charge as given, and the refusal to charge as requested, it seems to us, prevented the jury from considering the influence and advantage to the defendants of the good character which they had established by the evidence. Appellate courts do not grant new trials, it is true, upon the mere misuse of a single word or phrase, unless it is seen that such misuse must necessarily, in connection with other matters, have deprived the defendant of some right, or prevented the jury from giving him the benefit of certain evidence. As the jury had a right to look upon this charge, the defense of good character was but a cunning, artful, and deceitful device, designed or adapted to entrap the court and jury. If the jury (as they must be presumed to have done) gave the meaning of

the expression "insidious influences" the only definition of which it is susceptible, it cannot be said that they were not misled thereby to the great prejudice of the defendants.  This, in connection with the exception to refusal to charge as requested, was such an error as to lead to a new trial.

Under the circumstances, good character was an element in the case important to the defendants, environed as they were by the testimony of the confessed thieves, with scarcely a circumstance pointing to guilt except as it had been created by one or another of those felons.  The accused had a right to an instruction to the jury by the court that their good character afforded a presumption against the charge made against them.  The court, in *Cancemi* v. *People*, 16 N. Y. 506, say: "This presumption arises from the improbability, as a general rule, that a person who has uniformly pursued an honest and upright course of conduct will depart from it, and do an act so inconsistent with it.  *  *  *  But in cases when the other evidence is nearly balanced, but slightly preponderating against the defendant, the presumption from proof of good character is entitled to great weight, and will often be sufficient to turn the scale, and produce an acquittal."  The language of the court last above given is such as to lead to the conclusion that the request to charge as hereinbefore stated was correct, and that the exception to the refusal of the court so to charge was an error.  See, also, to the same effect, the case of *Remsen* v. *People*, 43 N. Y. 8.  The learned judge also, after pointing out to the jury the presumption of innocence of parties accused of crime, said: "And before they can be called upon either to defend themselves or to deny the fact of their guilt, they must be proven guilty beyond a reasonable doubt; that is to say, in the first instance, it is sufficient for the people to prove such a case as that, without any explanation on the part of the defendant, there would be no doubt left in the minds of the jury as to his guilt; but when the whole evidence is in, then the burden is so far shifted that, from all the evidence that the people and the defendants give, there shall be left no doubt as to the guilt or innocence of the accused."  Again, he says, seven pages thereafter: "So, gentlemen, you will carefully consider all the facts and all the circumstances and all the testimony given here on behalf of the people, to the end that you may ascertain whether, taken as a whole, it completes such a chain of evidence that there is no reasonable doubt in your mind as to the guilt or innocence of these defendants."  If by these two portions of the charge, occurring so widely separated, the learned judge intended to instruct the jury that the burden of proof was, in a criminal trial, ever shifted from the people and thrown upon the defendant, or that, if the jury had any reasonable doubt of the innocence of the accused upon the whole evidence in the case, they could render a verdict of guilty, no one would be swifter than himself to correct any such impression, and to restore the case as he had elsewhere clearly stated it,—that it was the people alone, and not the accused, who must maintain their contention beyond a reasonable doubt.  Judgment and conviction appealed from should be reversed, and new trial granted.

DWIGHT, P. J., concurs in result, on the ground of error of the court in the charge to the jury.